UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,                         Case No. 1:23-cr-20676

v.                                        Honorable Thomas L. Ludington
                                               United States District Judge

JEFFREY BARTLETT, et al.,

               Defendants.

_____/

**OPINION AND ORDER (1) GRANTING DEFENDANT BRIAN BARTLETT'S MOTION TO IDENTIFY ALTERNATE JURORS; (2) DENYING DEFENDANTS' MOTION TO COMPEL COCONSPIRATOR STATEMENTS; (3) GRANTING THE GOVERNMENT'S MOTION FOR A PRETRIAL EVIDENTIARY HEARING**

       Before this multi-defendant conspiracy and wire fraud case proceeds to trial, the Parties

have filed various motions concerning procedural, evidentiary, and constitutional concerns. This

Opinion and Order resolves three. First, Defendant Brian Bartlett's Motion to identify alternate

jurors will be granted, and this Court will ensure that voir dire accords with Criminal Rule 24.

Second, Defendants' Motion to Compel Coconspirator statements will be denied because the

Government has already produced the statements and because—with sufficient redaction and juror

instruction—neither exclusion nor severance is necessary to safeguard Defendants' Sixth

Amendment confrontation rights. Third, the Government's unopposed Motion for a pretrial

hearing to determine the admissibility of unstipulated business records will be granted in the

interests of judicial efficiency.

**I.**

       Defendants Jeffrey Bartlett, Brian Bartlett, Andrew Semenchuk, Adam Ball, and Anthony

Thelen are currently charged with conspiracy to commit wire fraud, 18 U.S.C. § 1349 (Count I);

conspiracy to defraud the United States, 18 U.S.C. § 371 (Count II); and twelve counts of wire fraud/aiding and abetting, 18 U.S.C. § 1342/18 U.S.C. § 2 (Counts III–XIV).[1] ECF No. 132. All charges arise from Defendants' alleged conduct involving Surveying Solutions Inc. (SSI), Michigan's "premier" construction and surveying consulting firm. *See About*, SSI, https://ssi-mi.com/about/ (last accessed May 13, 2025) [https://perma.cc/T2TW-EQVV]. Generally, the Government alleges that Defendants equally controlled SSI and used it, and three affiliated shell companies, to defraud the United States of millions of dollars through federally funded contracts with the Michigan Department of Transportation (MDOT) from early 2011 through mid-2019. *See id.* at PageID.1508 (alleging "80-90%" of the relevant contracts between SSI and MDOT were funded by the United States Department of Transportation through the Federal Highway Administration).

### A.

Defendants' offense conduct can be succinctly distilled into three parts. This Court has detailed the relevant factual and regulatory background for each part in several prior Opinions. *See, e.g.*, *United States v. Bartlett*, 731 F. Supp. 3d 836, 840–49 (E.D. Mich. 2024), *aff'd sub nom. United States v. Semenchuk*, No. 24-1405, 2024 WL 4751486 (6th Cir. Oct. 18, 2024); *United States v. Bartlett*, No. 1:23-CR-20676, 2024 WL 4642857, at *1–8 (E.D. Mich. Oct. 31, 2024). Only the most important information will be repeated here.

*Part one.* First, the Government alleges Defendants agreed and conspired to fraudulently obtain and maintain SSI's certification as a Disadvantaged Business Enterprise (DBE) to obtain preferential status when bidding on transportation contracts with MDOT. *See id.* at PageID.1513–

---

[1] This Court recently granted Defendants' unopposed motion to dismiss one of the substantive wire fraud counts as barred by the applicable statute of limitations, *see* ECF No. 233, so the Counts of the operative Indictment have been renumbered for clarity.

16. In short, the United States Department of Transportation (USDOT) created the DBE Program to increase small and diverse business participation in the government contracting industry and requires state transportation agencies that receive federal funding—like MDOT—to set certain DBE participation goals in certain contracts. *See Bartlett*, 2024 WL 4642857, at *2. But only independent, small businesses, owned by a socially or economically disadvantaged individual, can be certified as DBEs. *Id.*; *see also* 49 C.F.R. §§ 26.65(a), 26.69(a), 29.67(a)(1), and 26.71(g).

The Government alleges that all five Defendants signed a "Secret Agreement" in 2011 that each would equally own a 20% share of SSI, along with the additional entities in the "SSI Group"—2SI Development, LLC (2SI); 3SI Building and Leasing, LLC (3SI); and Southfield IT. *See* ECF No. 132 at PageID.1511, 1514–15. Yet, despite this agreement, the Government alleges Defendants falsely and repeatedly represented to MDOT that Defendant Andrew Semenchuk—an Asian Pacific Islander—was the sole owner of SSI. *See id.* at PageID.1515. And the alleged goal of these misrepresentations was simple: falsely certify SSI as a DBE so it may receive more contracts, and Defendants may have more opportunities to overbill MDOT on artificial expenses. *See generally* ECF No. 132. Indeed, seemingly in celebration of SSI's false DBE certification, Defendant Jeffrey Bartlett emailed all other Defendants as follows:

> Not bad for a bunch of white guys trying to be a minority-owned business . . . And we will be billing the FUCK out of August thru November for sure.

*Id.* at PageID.1516 (emphasis in original).

***Part two.*** This brings us to part two: Defendants' alleged overbilling. Generally, once SSI completed a contract—regardless of whether it was awarded because of SSI's DBE status—MDOT paid SSI an 11% profit margin and reimbursed SSI for (1) its direct labor costs, and (2) its other reasonably-incurred expenses, as part of SSI's annual "overhead rate." *See Bartlett*, 2024 WL

- 3 -

4642857, at *4–5 (internal record citations omitted). But the Government alleges Defendants artificially created and inflated both types of reimbursement expenses.

First, the Government alleges Defendants artificially inflated SSI's direct labor costs by billing MDOT for the work of their spouses and romantic partners, even though their partners never meaningfully worked for SSI. *See* ECF No. 132 at PageID.1510, 1519–20. Indeed, in September 2015, Defendant Jeffrey Bartlett sent all other Defendants an email titled "Our Hours," which stated they would "have a tough time billing out projects if [they] d[id] not have more time to put on them that is *semi-legitimate.*" ECF No. 113-2 at PageID.1352 (sealed) (emphasis added). Defendant Ball asked the group whether Defendants could "raise hours/wages for [their] wives." *Id.* Defendant Jeffrey Bartlett responded that Defendants "may have to give [their wives] bigger raises[.]" *Id.* And, in May 2016, Defendant Semenchuk emailed all Defendants suggesting they tell MDOT that their wives "performed marketing duties" because Defendants gave their wives "large bonuses" which "need[ed] to [be] justif[ied]." ECF No. 113-3 at PageID.138. At bottom, the Government estimates that, from 2016 through 2018, Defendants billed MDOT over $850,000 to compensate for the work their wives never performed. *Bartlett*, 2024 WL 4642857, at *6–7 (citing ECF No. 88-1 at PageID.480 (sealed)).

Second, at the core of its case, the Government alleges Defendants fraudulently increased SSI's reimbursable overhead rate by charging MDOT rental expenses that SSI never incurred. Contractors may generally include rental costs in purported overhead expenses, subject to reimbursement. *See* 48 C.F.R. § 31.205-36. But, critically, if a contractor rents real or personal property from a *commonly controlled entity*, federal regulations prohibit the contractor from including these costs. Instead, contractors renting from commonly controlled entities can only include—as part of their reimbursable overhead rate—the *normal costs of ownership*:

"depreciation, taxes . . . and maintenance" for the specific piece of rented property. 48 C.F.R. § 31.205–36(b)(3); *see also* ECF No. 132 at PageID.1518.

Recall that, allegedly, all Defendants agreed in writing in 2011 to equally own SSI, 2SI, 3SI, and Southfield IT.[2] Yet the Government alleges Defendants concealed this—and other— evidence of common control from MDOT to obtain inflated reimbursements on rental costs. *See Bartlett*, 2024 WL 4579926, at *5–7. And each entity had a distinct role to play.

2SI was SSI's equipment supplier. Organized in 2004 by Defendant Brian Bartlett, 2SI rented company cars and surveying equipment to SSI. *Id.* at *5. The government alleges SSI fraudulently sought MDOT's reimbursement for these rental costs in full, and MDOT auditors estimate that, as a result of Defendants' fraudulent misrepresentations, from 2016 through 2018 alone, SSI overbilled MDOT nearly $4,000,000 for surveying equipment rentals and an additional $2,000,000 for company car rentals from 2SI. *See id.* at *5-6 (detailing examples of this overbilling).

3SI was SSI's landlord and leased SSI its offices and headquarters in St. John's and Standish, Michigan. ECF No. 88-1 at PageID.468 (sealed). Co-founded in 2009 by Defendants Bryan Bartlett, Jeffrey Bartlett, and Anthony Thelen, 3SI had no clients other than SSI and, from 2016 through 2018, received 99% of its funding through SSI. *Id.*1 at PageID.467, 478. Had Defendants disclosed this alleged common control, the Government alleges, SSI only would have received reimbursements for the "normal costs of ownership" on these properties, such as taxes, depreciation, and maintenance expenses. ECF No. 132 at PageID.1518–19; *see also* 48 C.F.R. §

---

[2] Southfield IT was not listed in the 2011 Secret Agreement because it was not created until after the Secret Agreement was signed. However, Defendants included Southfield IT in the SSI Group and ensured that, consistent with all other SSI Group entities included in the 2011 Secret Agreement, each Defendant received an equal 20% share of Southfield IT's profits at the end of each fiscal year. *See* ECF No. 113-1 at PageID.983 (sealed).

31.205–36(b)(3). But, by allegedly concealing this common control, Defendants overbilled MDOT for SSI's property rental costs to 3SI by over $500,000 from 2016 through 2017. ECF No. 88-1 at PageID.508 (sealed).

Southfield IT was, as its name suggests, SSI's IT provider. Once Southfield IT's account was opened, the Government alleges that 99.9% of its funding was furnished through SSI and Defendants. *Id.* at PageID.464–65; *see also* ECF No. 132 at PageID.1517. The Government also alleges that 95.9% of these funds were "ultimately transferred back" to Defendants and their spouses. ECF No. 132 at PageID.1517; *see also* ECF No. 88-1 at PageID.465 (sealed) (listing withdrawals from Southfield IT's bank account from January 2016 through 2019). Despite this evidence of common control, Defendants allegedly told MDOT that Southfield IT was independent from SSI, and created "fictitious contracts and invoices" between the two companies to "fraudulently inflate their overhead costs, which were then reimbursed by MDOT." ECF No. 132 at PageID.1516. SSI billed MDOT a total of *$1,575,304.30* for IT services it purportedly purchased from Southfield IT throughout FY 2015, 2016, and 2017. ECF No. 88-1 at PageID.463 (sealed). But the Government alleges that SSI actually spent "less than *$145,184.73* on IT services . . . from January 2016 through February 2019." *Id.* (emphasis added). MDOT estimates that, from 2016 through 2018, it overpaid SSI nearly $2,000,000 "as a result of [Defendants'] fraudulent representations regarding IT expenditures." *Id.* at PageID.467.

The Government also uncovered evidence suggesting that—unlike the other SSI Group shells—Southfield IT was nothing more than a pass-through entity. Throughout its investigation, the FBI interviewed "Individual A," the owner of Network Services Group (NSG). *Id.* at PageID.466–67. Individual A reported to the FBI that NSG—rather than Southfield IT—provided SSI with IT services as early as 2009. *Id.* at PageID.466. Defendants' emails corroborate this

interview. On December 31, 2014, Defendant Semenchuk sent Defendants Adam Ball, Brian Bartlett, and Jeffrey Bartlett an email entitled "SSI IT Company," which noted that all Defendants had discussed "forming an IT company for OH reasons"[3] and suggested that "all of [NSG']s bills [could] go to this new company" such that the expenses could "be marked up before [being] sent to SSI." ECF No. 113-1 at PageID.1007 (sealed). All other Defendants replied in agreement. *Id.* at PageID.1008. 1010, 1012–13. In accordance with these emails, Individual A reported to the FBI that, in early 2016, Defendant Semenchuk "began directing [him] to re-issue certain SSI invoices to Southfield IT," such that he "understood that NSG's work always supported SSI regardless of [whether] it was billed to SSI or Southfield IT[.]" ECF No. 88-1 at PageID.467 (sealed).

*Part three.*   But where did Defendants' alleged overbilling profits go? According to the Government, all proceeds were funneled directly and indirectly back to Defendants and their spouses. ECF No. 132 at PageID.1520–22. Indeed, the Government alleges Defendants personally benefit from the fruits of their alleged fraudulent overbilling labor by "equalizing" the income of all SSI Group companies—SSI, 2SI, 3SI, and Southfield IT—such that each Defendant received, consistent with the 2011 Secret Agreement, their 20% share of the Group's net income at the end of each fiscal year. *Id.* To do so, the Government alleges Defendants offered fictitious "loans" to one another and took fake loans from the SSI Group entities, with the expectation that the loans would never be paid. *Id.*; *see also Bartlett*, 2024 WL 4579926, at *8.

## B.

Trial is scheduled to begin in late September 2025. *See* ECF No. 203. But the Parties have filed pretrial motions which must be addressed first. This Opinion & Order resolves three: (1)

---

[3] The Government alleges that "OH" referred to SSI's reimbursable overhead rate. *See* ECF No. 113-1 at PageID.974–75.

Defendants' Motion to Identify Alternate Jurors, ECF No. 202; (2) Defendants' Motion to Compel Coconspirator Statements, ECF No. 207; and (3) the Government's Motion for a Pretrial Hearing to Determine the Admissibility of Unstipulated Evidence, ECF No. 212. Each motion will be considered in turn.

## II. Defendant Brian Ball's Motion to Identify Alternate Jurors

At a virtual status conference on February 25, 2025, the Court informed the Parties that the alternate jurors would be randomly selected at the conclusion of trial, before deliberation. *See* ECF No. 202 at PageID.2304. The undersigned has historically utilized this practice, with the parties' permission, to ensure that all jurors maintained focus throughout trial, and minimize the risk that known alternates would skirt their obligations and duties. But Defendant Brian Bartlett filed a motion seeking an order that the alternates would be empaneled in specific seats throughout voir dire—known to the Parties and this Court but not the jurors—because such practice is more consistent with Criminal Rule 24. ECF No. 202. The Government does not object to this procedure and, accordingly, did not file a response. *See id.* at PageID.2305.

Criminal Rule 24 governs the procedure for impaneling, examining, and challenging jurors. The Rule allows courts to "impanel up to 6 alternate jurors to replace any jurors who are unable to perform or who are disqualified from performing their duties." FED. R. CRIM. P. 24(c)(1). The number of alternates impaneled impacts the Parties' peremptory challenges. In this non-capital felony case, the Government has six peremptory challenges and Defendants jointly have ten. *See* FED. R. CRIM. P. 24(b). But each side is entitled to additional challenges, based on the number of impaneled alternates:

(1) If the Court impanels one or two alternates, each Party receives *one* additional peremptory challenge;
(2) If the Court impanels three or four alternates, each Party receives *two* additional peremptory challenges; and

> (3) If the Court impanels five or six alternates, each Party receives *three*
>    additional peremptory challenges.

FED. R. CRIM. P. 24(c)(4). Understandably, the Rule requires these additional peremptory strikes to be used "only to remove alternate jurors." *Id.*

As explained by the Sixth Circuit, this requirement "assumes that alternate jurors will be designated separately—and sequentially—before the trial begins." *United States v. Delgado*, 350 F.3d 520, 525 (6th Cir. 2003). In contrast, selecting alternates "by random draw just prior to . . . deliberations," although perhaps less complex, is "inconsistent" with Rule 24. *Id.*; *see also United States v. Sivils*, 960 F.2d 587, 593–94 (6th Cir.) (characterizing post-trial, pre-deliberation alternate juror identification as a "departure from" Rule 24).

Consistent with this precedent and Rule 24, this Court will employ the "jury box system" for alternate juror identification. *See Delgado*, 350 F.3d at 525 n.7. At the Final Pretrial Conference scheduled for July 11, 2025, this Court will inform Counsel which specific seats within the jury box are designated for the alternate jurors, thus allowing the Parties to properly exercise their additional alternate peremptory strikes throughout voir dire. Defendant Brian Bartlett's unopposed Motion seeking this relief, ECF No. 202, will be granted.

### III. Defendants' Motion to Compel Coconspirator Statements

On March 31, 2025, Defendant Anthony Thelen filed a motion to compel. ECF No. 207. All Defendants other than Brian Bartlett have since filed notices of joinder and concurrence. ECF Nos. 215; 217; 219. Defendants' Motion is twofold. First, the motion seeks to compel the Government to "(1) identify the specific codefendant statements it intends to use in its case-in-chief, (2) produce complete recordings and transcriptions of those statements it intends to utilize as part of the testimony, and (3) produce any proposed redaction it intends to make to those statements." ECF No. 207 at PageID.2325–26. After stipulated adjournments, the Government

identified the specific Codefendant statements it intends to use at trial and produced its proposed redactions on May 27, 2025. ECF No. 231 (sealed). So this aspect of Defendants' Motion to Compel is moot.

The only issue that remains is whether the admission of the identified statements—as redacted by the Government—violates Defendants' Sixth Amendment confrontation rights. *See* ECF No. 207 at PageID.2326. As explained below, it does not. So Defendants' request to preclude these statements or, alternatively, sever the joint trial will be denied.

## A.

This issue lies at the intersection of two Constitutional protections. The Fifth Amendment provides criminal defendants with a privilege against self-incrimination. U.S. CONST. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself."). The Sixth Amendment provides criminal defendants with the right to confront all opposing witnesses. U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him."). But what happens when, as is common in conspiracy cases, multiple defendants are tried at the same time and the Government attempts to admit one codefendant's confession that incriminates another? If the confessing codefendant invokes their Fifth Amendment privilege against self-incrimination, the other, incriminated codefendant has no Sixth Amendment opportunity to confront.

To solve this problem, "[w]here two or more defendants are tried jointly, . . . the pretrial confession of one of them that implicates the others is [generally] not admissible against the others unless the confessing defendant waives his Fifth Amendment rights so as to permit cross-examination." *Cruz v. New York*, 481 U.S. 186, 189 (1987); *see also Richardson v. Marsh*, 481 U.S. 200, 206 (1987) ("[W]here two defendants are tried jointly, the pretrial confession of one

cannot be admitted against the other unless the confessing defendant takes the stand."). But Supreme Court precedent "distinguish[es] between confessions that *directly* implicate a defendant and those that do so *indirectly*." *Samia v. United States*, 599 U.S. 635, 648 (2023) (emphasis added). The latter may be admissible in joint trials when sufficiently redacted and accompanied by mitigating jury instructions.

Begin with *Bruton v. United States*, 391 U.S. 123 (1968). There, two codefendants were jointly tried for armed robbery. *Id.* at 124. But one confessed pretrial and, in so doing, referenced his codefendant by name. *Id.* Although the confessing codefendant did not testify, the Government admitted his confession—unaltered and unredacted—at trial, and the Court issued a limiting instruction that the jury could only consider it against the confessing codefendant. *Id.* at 124–25. But the Supreme Court found such limiting instruction insufficient in isolation. Indeed, the Court found a "substantial risk" that the jury would ignore or overlook the instruction and impermissibly consider the confession against the implicated codefendant in violation of that codefendant's right to confront. *Id.* at 126. Although the Court recognized the general presumption that jurors "can and will follow" instructions, it noted "some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of the failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id.* at 135. And such context exits where "powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." *Id.*

The Court constrained *Bruton* twenty years later. In *Richardson v. Marsh*, two codefendants were jointly tried for assault and murder. 482 U.S. at 202–03. Like in *Bruton*, one of the *Richardson* codefendants confessed pretrial, and the Government introduced the confession at trial, even

- 11 -

though the confessing codefendant did not testify. *Id.* at 203. Like in *Bruton*, the trial judge instructed the jury to only consider the confession against the codefendant who rendered it. *Id.* at 205. But, unlike in *Bruton*, the Government redacted the confession "to omit all reference" to the other codefendant. *Id.* at 203. Indeed, the confession omitted all reference to "*anyone* other than" the confessing codefendant. *Id.* (emphasis in original). This distinction made a difference. The Supreme Court held that, since the confession was sufficiently redacted, it did not "expressly implicate" the non-confessing codefendant, so the "very narrow" holding in *Bruton* did not control. *Id.* at 200, 208. To the contrary, the Court expressly noted that "*Bruton* can be complied with by redaction" and held that, with redactions, the confession at issue "was not incriminating on its face, and became so only when linked with evidence introduced later at trial." *Id.* at 208–09. This, the Court held, did not violate the Sixth Amendment when coupled with limiting jury instructions because the risk that the jury would disregard such instructions is "less valid" than when instructions apply to unredacted confessions. *Id.* at 708.

But *Richardson* declined to address "the admissibility of a confession in which the defendant's name has been replaced with a symbol or a neutral pronoun." *Id.* at 211 n.5. The Court grappled with this gray area in *Gray v. Maryland*, 523 U.S. 185 (1998). There, like in *Richardson*, a nontestifying defendant's confession was admitted into evidence at trial. *Id.* at 188. But unlike the redacted confession in *Richardson* that omitted all references to any other person, the redacted confession in *Gray* merely covered the names of the participating codefendants with a "blank white space" or replaced their names with the word "deleted." *Id.* at 188, 192. The Supreme Court found this redaction rather meaningless, and concluded the confession was closer to the inadmissible unredacted one in *Bruton* than the admissible redacted one in *Richardson*. Indeed, the Court held that "[r]edactions that simply replace a name with an obvious blank space or a word such as

- 12 -

'deleted' or a symbol or other similarly obvious indications of alteration . . . leave statements that . . . so closely resemble *Bruton*'s unredacted statements that, in our view, the law must require the same result." *Id.* at 192–93 (noting such redactions "will not likely fool anyone" and that any juror "somewhat familiar with criminal law" would "immediately" fill the blank with the implicated codefendant); *see also id.* at 196 (noting a "redacted confession with the blank prominent on its face . . . facially incriminates the [non-confessing] codefendant" (cleaned up)).

So, after this trilogy, it was implied that non-testifying defendant pretrial confessions could be admitted at trial without violating any codefendants' Sixth Amendment confrontation rights, so long as the jury was instructed to only consider the confession against the declarant defendant, and so long as the confession was meaningfully redacted to avoid "obvious" references to the nondeclarant codefendants. The Supreme Court recently made this implication explicit.

In *Samia v. United States*, three codefendants were jointly tried for, among other crimes, an alleged conspiracy to commit murder-for-hire. 599 U.S. 635, 640 (2023). One of the defendants—who did not testify at trial—confessed pretrial, implicating one of his codefendants by name. *See id.* at 640–41. The Government admitted this confession at trial but redacted the confession to "avoid[] any obvious indications of redaction" or reference to the implicated codefendant. *Id.* at 641. Indeed, unlike the insufficient blank-space redaction in *Gray*, the Government replaced all references to the codefendants' names with the phrase "other person." *Id.* at 642. And the district court instructed the jury that the confession was only admissible against the defendant who rendered it. *Id.* The Supreme Court held that this redaction, coupled with the limiting instruction, was sufficient to protect the implicated codefendant's Sixth Amendment confrontation rights. *Id.* at 653–54.

**B.**

The admission of Defendants' identified pretrial statements does not deprive any Defendant of their Sixth Amendment confrontation rights. For starters, these rights are only implicated *if* a Defendant chooses not to testify, that is, invokes their Fifth Amendment privilege against self-incrimination. If, for example, all Defendants testify at trial, the admission of their pretrial statements accords with the Sixth Amendment because all Defendants can be confronted through cross-examination. No Defendant has suggested they will not take the stand at trial. So the preclusion Defendants seek is somewhat premature.

But even assuming the declarants of all the pretrial statements the Government intends to use do not testify at trial, the admission of the statements—as redacted by the Government—does not run afoul of any Defendant's confrontation right. The Government proposes that this Court read the Sixth Circuit's pattern instruction for consideration of codefendant statements to the jury before each statement is introduced into evidence:[4]

> You are about to hear evidence that [the name of the declarant-Defendant] provided a statement to law enforcement agents. You can only consider this testimony against [the name of the declarant-Defendant] in deciding whether the Government has proved him guilty. You cannot consider it in any way against any of the other Defendants.

*See* ECF No. 231-7 (sealed) (modifying Sixth Circuit Pattern Jury Instruction 7.18). And the Government has redacted each proposed statement in the exact manner recently affirmed by the

---

[4] As slightly modified, the instruction can—and will—be repeated at the close of proofs, just before deliberation. *See* Sixth Circuit Pattern Jury Instruction 7.18 ("You *have heard* testimony from [name of Defendant] that [describe testimony]. You can only consider this testimony against [name of Defendant] in deciding whether the government has proved him guilty. You cannot consider it in any way against any of the other defendants." (emphasis added)).

Supreme Court in *Samia*. Each statement—and the Government's proposed redactions—will be discussed in turn.

**1.**

First, the Government anticipates admitting Defendant Ball's July 25, 2019 confession to the FBI, as agents searched SSI's corporate offices. *See* ECF No. 231-1. This Court discussed this confession in detail when denying Defendant's Ball's motion to suppress it on *Miranda* grounds. *See United States v. Ball*, No. 1:23-CR-20676-3, 2025 WL 1644016, at *4-7 (E.D. Mich. June 10, 2025). Relevantly, Defendant Ball stated that (1) his wife worked "zero hours" for SSI, (2) he and his Codefendants created Southfield IT as a "shell company," (3) SSI billed MDOT over $800,000 for Southfield IT services when, in fact, SSI only paid about $30,000 for such services, (4) he and his Codefendants knew that billing MDOT for fictious or inflated expenses would increase SSI's overhead rate, and (5) through this scheme, he and his Codefendants "g[o]t money from the State of Michigan that [they] weren't entitled to." *See id.* Indeed, Defendant Ball stated that he was "sorry" for what he had done, felt "ashamed" and "sick to his stomach," and what he and his Codefendants did was "not ok." *Id.* at *7.

Throughout this 108-page confession, the Government has sufficiently redacted all references to Defendant Ball's Codefendants—both general and specific. For example, like in *Samia*, the Government replaced all references to Defendant Ball's Codefendants with the phrases "other person," "another person," "other persons," and, simply, "others." ECF No. 231-1 at PageID.2467–69, 2474, 2491–92, 2497–98, 2501–02, 2506, 2508–11, 2518, 2523-33 (sealed). Indeed, the Government even replaced Defendant Ball's voluntary description of Defendants as a "five-headed monster" with the phrase "multi-headed monster" to avoid any obvious numerical

inference that the "monster" is comprised of the five indicted Defendants who will sit at counsel table at trial. *Id.* at PageID.2533–34, 2540.

Contrary to Defendants' premature argument, this redaction sufficiently safeguards their Sixth Amendment rights. The Government need not omit all generalized or "neutral" references to other persons. Indeed, in *Samia*, the Supreme Court recognized that such omission is not "feasible" and that, in conspiracy cases, "the evidence of coordination" between the declarant defendant and others—whether the charged codefendants or not—is "necessary to prove . . . essential element[s] of the Government's case." *Samia*, 599 U.S. at 653. So the Government need not nitpick Defendant Ball's confession to "make it appear [as if] he . . . acted alone." *Id.* It also matters not that the jury may be able to infer the identities of these "other persons" through other evidence admitted throughout trial. *Id.* ("[N]either *Bruton*, *Richardson*, not *Gray* provides license to flyspeck trial transcripts in search of evidence that could give rise to a collateral inference that [a] defendant had been named in an altered confession."); *see also Richardson*, 481 U.S. at 209 (refusing to extend *Bruton* to "confessions incriminating by connection").

At bottom, Defendant Ball's confession has been "redacted to avoid naming" any other Codefendants, "satisfying *Bruton*'s rule." *Samia*, 599 U.S. at 653. And the confession was "not obviously redacted in a manner resembling the confession in *Gray*" because the "neutral references to some 'other person'" are "not akin to an obvious blank or the word 'deleted.'" *Id.* The Sixth Amendment requires nothing more. *See United States v. Vasilakos*, 508 F.3d 401, 407–08 (6th Cir. 2007) (finding no Sixth Amendment violation when a non-testifying defendant's pretrial statement was admitted at trial, because the statement was redacted such that the codefendants' names were "substituted . . . with the neutral noun 'person' or phrase 'another person'").

**2.**

- 16 -

Second, the Government anticipates introducing a handwritten letter Defendant Brian Bartlett wrote to the FBI agents who searched the SSI corporate offices on July 25, 2019. ECF No. 231-2 (sealed). In this letter, after detailing SSI's founding in 2001, Defendant Brian Bartlett stated that his wife "does not actually work in the office." *Id.* He also stated that he was "very sorry that 2SI, 3SI & Southfield IT were ever created" and that Defendants used these companies "as a mechanism" to "inflate" SSI's overhead rate. *Id.*

The Government has not proposed any redactions to this letter. *Id.* But none are necessary. Because Defendant Brian Bartlett does not refer to any Codefendant by name, and instead uses only the neutral and nondescript pronouns "we" and "our," *id.*, the letter does not "necessarily implicate" any "specific" Codefendant, nor their Sixth Amendment rights. *United States v. Sherrill*, 972 F.3d 752, 763 (6th Cir. 2020) (holding "neutral term[s]" within pretrial confessions that do not specifically refer to codefendants cannot violate those codefendants' Sixth Amendment confrontation rights); *see also United States v. Al-Din*, 631 F. App'x 313, 321 (6th Cir. 2015) (explaining that "neural phrases" within a pretrial confession do "not refer[] to [a codefendant] at all" and thus "avoid" Sixth Amendment violations).

### 3.

Third, in addition to his letter, the Government anticipates admitting relevant statements that Defendant Brian Bartlett made to the FBI during the July 25, 2019 searches of SSI offices. ECF Nos. 231-3 (sealed); 231-4 (sealed). Relevantly, Defendant Brian Bartlett stated that his wife did not work for any SSI Group entity and was not a "real employee." ECF No. 231-4 at PageID.2569. Moreover, he agreed with FBI agents that 2SI, 3SI, and Southfield IT were shell companies created to "line [Defendants'] pockets" and that he and his Codefendants "got carried away with how much extra money they were getting" by using these companies to artificially

inflate SSI's reimbursable overheard rate. *See* ECF No. 231-3 at PageID.2564–65 (sealed); *see also* ECF No. 231-4 at PageID.2568 (detailing Defendant Brian Bartlett's statements that "2SI, 3SI, and Southfield IT were all shell companies," that "[t]he work Southfield IT does is not legitimate," and that "2SI, 3SI and Southfield IT were used to artificially inflate costs"). Indeed, Defendant Brian Bartlett apologized and admitted that 2SI, 3SI, and Southfield IT were "wrong." ECF No. 231-3 at PageID.2565 (sealed).

Like Defendant Ball's confession, the Government has sufficiently redacted all of Defendant Brian Bartlett's pretrial statements by replacing all references to Codefendants with references to neutral, general "other persons." *See* ECF Nos. 231-3 at PageID.2564–65 (sealed); 231-4 at PageID.2568 (sealed). So, like Defendant Ball's confession, the admission of Defendant Brian Bartlett's redacted pretrial statements poses no Sixth Amendment problems.

**4.**

Fourth, the Government has identified several statements Defendant Jeffrey Bartlett made to the FBI during its search of SSI on July 25, 2019. *See* ECF Nos. 231-5 (sealed); 231-6 (sealed). Defendant Jeffrey Bartlett admitted that all of Defendants' spouses and romantic partners "d[id]n't do crap" for SSI or any SSI Group entity, despite their handsome paychecks. ECF No. 231-5 at PageID.2574 (sealed). He also admitted that—through 2SI, 3SI, and Southfield IT—SSI "got money it shouldn't have." ECF No. 231-6 at PageID.2577 (sealed). Like all other pretrial statements the Government anticipates admitting, it has sufficiently redacted all Codefendant references to avoid any Sixth Amendment violations. *See generally* ECF Nos. 231-5 (sealed) (replacing Codefendant references with references to "other persons" and similar neutral, nonspecific phrases); 231-6 (sealed) (same).

In sum, the Government's proposed redactions protect Defendants' Sixth Amendment right to confront. So, even if Defendant Ball, Jeffrey Bartlett, or Brian Bartlett choose not to testify, their identified, redacted pretrial statements are admissible with the proposed instruction that the statements can only be considered against them. Neither evidentiary exclusion nor severance[5] is necessary. Defendants' Motion to Compel will be denied.

### IV. The Government's Motion for a Pretrial Evidentiary Hearing

Finally, this Court turns to the Government's Motion for a Pretrial Hearing to Determine the Admissibility of Unstipulated Evidence. ECF No. 212. The Government anticipates attempting to admit various business records through Evidentiary Rule 803(6), excepting from the rule against hearsay specific records that are:

(A) Made at or near the relevant time by someone with knowledge;
(B) Kept in the course of a regularly conducted business activity
(C) Made as part of a regular practice of that activity;
(D) Introduced through a qualified custodian; and
(E) Do not lack trustworthiness.

See FED. R. EVID. 803(6). Although the Government indicated it would seek to stipulate the admissibility of many records before trial, the Government seeks a hearing—at least 30 days before trial—to determine the admissibility of any records that Defendants will not stipulate to. ECF No. 212 at PageID.2389–90.

Indeed, the Government provided Defendants with an itemized list of all anticipated trial evidence—including the proposed business records—in early May 2025. *Id.* at PageID.2387.

---

[5] As Defendants recognize, severance is disfavored. ECF No. 207 at PageID.2334. Indeed, severance under Criminal Rule 14 is only appropriate if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. *Zafiro v. United States*, 506 U.S. 534, 539 (1993). But, as explained, a joint trial does not deprive any Defendant of their right to confront under the Sixth Amendment. And Defendants do not argue that any of their other trial rights are at risk, nor that a joint trial would result in an unreliable jury judgment. *See* ECF No. 207 at PageID.2334.

According to the Government, no record in this itemized list is new: Defendants were provided all anticipated records throughout discovery. *See id.* And the Government indicated that, soon after this May production, it would seek Defendants' stipulation concerning the admissibility of as many records as possible.[6] *Id.* But, nearly two months later, no stipulation has been filed.

In the interest of judicial efficiency, and because the Government's Motion is unopposed, this Court will grant the Government's Motion for a narrow pretrial evidentiary hearing to determine the admissibility of unstipulated records under Rule 803(6). The evidentiary hearing will be scheduled to occur on July 11, 2025 at 10:00 AM, immediately preceding the already-scheduled *Lafler* hearing and final pretrial conference. *See* ECF No. 203.

But the scope of the anticipated business records is sweeping, and the number of records is seemingly voluminous.[7] To help the Court prepare for the hearing, the Government will be directed to file under seal—on or before July 7, 2025—a copy of the exhibit log it produced to Defendants in early May 2025. And Defendants will be directed to file—also on or before July 7,

---

[6] The stipulation would seemingly only address whether the records are admissible as an exception to hearsay under Rule 803(6). *See* ECF No. 212 at PageID.2386–87. Indeed, the Government notes that the anticipated stipulation would "not preclude the [P]arties from offering foundational evidence or from objecting . . . based on relevance or [Federal Evidentiary Rule] 801(d)(2)(E)." *Id.* at PageID.2389.

[7] The Government describes the relevant records as:

- Documents obtained from the USDOT and MDOT, including prequalification packages and correspondence;
- DBE applications, affidavits, transcripts, and related communications;
- Emails obtained from SSI's corporate servers reflecting "conversations [D]efendants had among themselves, with other employees of SSI, with officials of MDOT and USDOT, and with [D]efendant's accountants";
- Documents seized from SSI's corporate offices, including "invoices, leases, contracts, applications, and financial records;
- Bank records, checks, statements, signature cards, and loan records.

*See* ECF No. 212 at PageID.2386–88.

2025—a list of the records they contend do not fall within Rule 803(6)'s exception to the rule against hearsay, along with a brief explanation of their Rule 803(6) argument. Nothing in this Opinion & Order prevents the Parties from filing a stipulation governing the admissibility of any record, or any other piece of evidence the Parties intend to introduce at trial.

**V.**

Accordingly, it is **ORDERED** that Defendant Brian Bartlett's Motion to Identify Alternate Jurors, ECF No. 202, is **GRANTED.** At the final pretrial conference scheduled to occur on July 11, 2025, this Court will inform Counsel which seats within the jury box are designated for the alternate jurors.

Further, it is **ORDERED** that Defendants' Motion to Compel, ECF No. 207, *see also* ECF Nos. 215; 217; 219, is **DENIED.**

Further, it is **ORDERED** that the Government's Motion for a Pretrial Hearing to Determine the Admissibility of Business Records, ECF No. 212, is **GRANTED.**

Further, it is **ORDERED** that the Parties are **DIRECTED** to attend an evidentiary hearing on July 11, 2025 at 10:00 AM to determine the admissibility of unstipulated-to business records that the Parties anticipate introducing at trial.

Further, it is **ORDERED** that the Government is **DIRECTED** to file under seal—on or before July 7, 2025—a copy of the itemized trial exhibit list it provided to Defendants in early May.

Further, it is **ORDERED** that Defendants are **DIRECTED** to file—on or before July 7, 2025—a document that (1) identifies the precise records they contend are inadmissible hearsay, and (2) briefly explains their evidentiary argument as to each challenged record.

**This is not a final order and does not close the above-captioned case.**

Dated: June 23, 2025                                  s/Thomas L. Ludington
                                                     THOMAS L. LUDINGTON
                                                     United States District Judge