UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN, NORTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,        No. 1:23-cr-20676-TLL

vs.                                   Hon. Thomas L. Ludington

D-5  ANTHONY THELEN

                Defendant.

**DEFENDANT THELEN'S SENTENCING MEMORANDUM**

I.    <u>Introduction</u>

The defendant, Anthony D. Thelen, has pled guilty to Count 2 of the Second Superseding Indictment alleging a conspiracy to defraud the United States stemming from his employment with Surveying Solutions, Inc. (SSI) and his association with the four co-defendants.  18 U.S.C. § 371; SECOND SUPERSEDING INDICTMENT, ECF No. 132, PageID.1508.

In virtually all respects, Mr. Thelen is different from his colleagues.  His role at SSI, how he approached the government's investigation, and how he resolved this case all set him completely apart.  He is worthy of a sentence of probation.

II.    <u>Presentence Investigation Report</u>

The Presentence Investigation Report (PIR) calculates Mr. Thelen's advisory guidelines as follows:

| Guideline | Points |
|---|---|
| **§ 2B1.1. Fraud and deceit**<br>(a) Base Offense Level:<br>     \* \* \*<br>     (2) **6**, otherwise.<br>(b) Specific Offense Characteristics<br>     (1) If the loss exceeded $6,500, increase the offense level as follows:<br>     Loss (Appy the Greatest)          Increase in Level<br>                \* \* \*<br>     (I)     More than $1,500,000          add **16**<br>                \* \* \*<br>**Adjusted Offense Level** | 6<br><br><br><br><br><br><br>16<br><br>**22** |
| **§ 4C1.1. Zero-Point Criminal History** | -2 |
| **Adjusted Offense Level** | **20** |
| **§ 3E1.1. Acceptance of Responsibility**<br>    (a) If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by **2** levels.<br>    (b) If defendant qualifies for the decrease, the offense level is **16** or greater, and the plea is timely, decrease by **1** additional level.<br><br>**Adjusted Offense Level** | <br><br>-2<br><br>-1<br><br>**17** |

PIR ¶¶ 42-52. Mr. Thelen has no criminal history, so the advisory guidelines range at total offense level 17 is 24 to 30 months' imprisonment. PIR ¶ 84.

The defense has one objection. It objects to the calculation of loss at $1,742,233.94. PIR ¶¶ 37, 43. It maintains that the government's calculation is inflated for several reasons and that the more accurate loss calculation is less than $1.5 million, which would reduce the specific offense characteristic from 16 to 14 points, U.S.S.G. § 2B1.1(b)(1)(H), and that the total offense level should be 15, not 17 points. *See* PIR ¶¶ 43, 52.

The government bears the burden of establishing the relevant facts to support an enhancement by a preponderance of the evidence. *United States v. Ziesel*, 38 F.4th 512, 515 (citing *United States v. Small*, 988 F.3d 241, 257 (6th Cir. 2021); *United States v. Silverman*, 889 F.2d 1531, 1535 (6th Cir. 1989)). This standard, while less

demanding than others, is "not toothless," as it "is the district court's duty to ensure that the Government carries this burden by presenting *reliable and specific evidence*." *United States v. Lawrence*, 47 F.3d 1559, 1566 (11th Cir. 1995) (emphasis supplied). Although the Court need only make a "reasonable estimate" of the loss amount, *United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011) (citing U.S.S.G. § 2B1.1, comment. n. 3(C)), it cannot speculate and the government must meet its burden. *United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007).

Here, the government's loss figure is inflated, and some background is required. SSI entered into different types of contracts with the Michigan Department of Transportation (MDOT), but only the ones that required an overhead calculation are at issue in this prosecution—"actual cost, fixed fee" (ACFF) contracts. SSI also entered into lump sum contracts with contractors doing MDOT work which were agreements to pay a specific amount for a specific project, irrespective of SSI's overhead. The defense maintains that SSI did a substantial amount of lump sum work and that the government's loss calculations rely upon assumptions and include figures associated with that work. This approach necessarily inflates the claimed loss amount.

It is beyond dispute, however, that SSI did lump sum work for MDOT contractors and that such work was not subject to the overhead calculation necessary for ACFF work, which is the subject of this prosecution. So, any calculation that includes lump sum work is necessarily inflated. The defense maintains that MDOT lump sum work represented about 20% of all MDOT work, which the government's

3

calculation does not take into account thereby inflating the total loss amount. Several observations support the conclusion that erroneous assumptions have been made and that a substantial amount of lump sum work has been included in the government's loss calculations based on overhead.

First, to begin its analysis the government's figures rely on the prequalification forms submitted by SSI. Those forms, however, request figures for *all* MDOT work performed, not just ACFF work. So, in Fiscal Year 2017, for example, the beginning figure upon which the government relies is $13,918,730 from the prequalification form that requested "revenue from MDOT projects," and it is from this figure that the government extrapolates back to arrive at an "assumed direct labor cost" of $4,285,814. In its settlement with MDOT later, however, SSI and MDOT agreed upon an audited direct labor figure of $3,603,512, which meant that the *assumed* direct labor figure originally utilized in the government's calculation was approximately 19% greater than the audited direct labor figure to which the parties agreed.

Second, these discrepancies can also be seen in the way in which loss calculations have been made throughout the case. For example, for the years 2016 through 2018, as described above, MDOT utilized "*assumed* direct labor" to determine the amount of loss. Yet, in the settlement process, the parties relied on *actual* audited or agreed-to figures for the direct labor cost, and the comparison is as follows:

| Year | *Assumed Direct Labor* | *Actual Direct Labor* | *Difference (dollars)* | *Inflated Percentage* |
|---|---|---|---|---|
| 2016 | 3,225,100 | 2,594,529 | 630,571 | 24.30 |
| 2017 | 4,285,814 | 3,603,512 | 682,302 | 18.93 |
| 2018 | 4,982,125 | 4,071,339 | 910,786 | 22.37 |
|  | 12,493,039 | 10,269,380 | 2,223,659 | 21.65 |

4

As this comparison illustrates, from an aggregate point of view there is at least a 20% difference between the audited figures and the assumed figures.

Third, the approximate 20% figure is also supported by comparing the government's claimed criminal loss number of $12,685,799 (calculated with *assumed* direct labor costs) with the gross figures from the civil settlements. For restitution, MDOT took the position that the best available figure for January 2012 through July 31, 2016, was $4,571,800. The MDOT settlement covered the remaining years from August 1, 2016, to July 31, 2019, resulted in a figure of $5,885,944.[1] These amounts for the entire timeframe (from January 2012 through July 31, 2019) total $10,457,744. So, there was a 20% difference between *assumed* criminal numbers and civil settlement numbers, again suggesting that the criminal loss number is inflated.[2]

Reducing the government's claimed loss figure of $1,742,233.94 by 20% yields a loss figure of $1,393,787.15, well below the guideline threshold of $1.5 million advocated by the government. So, under the sentencing guidelines 14, not 16, points should be scored for the specific offense characteristic of loss. U.S.S.G. § 2B1.1(b)(1)(H). And, as a consequence the total offense level should be 15, not 17, with an advisory guidelines range of 18 to 24 months.

---

[1]This figure is also corroborated by the negotiations for SSI's nonprosecution agreement. In that process, the government acknowledged that SSI had already paid $3,564,031 to MDOT and forewent another $2,321,912 in overhead rate charges to satisfy the balance of MDOT's claims, for a total of $5,885,943.

[2]The government's criminal calculations also do not take into account that in the case of IT expense Mr. Thelen did not learn of the problem until the later in the year of loss, so he should not be held responsible for losses caused before he became aware, which further indicates that the criminal loss figure is inflated.

That said, the difference between the government's assumed approach and Mr. Thelen's more specific approach is not all that great given all that has been at issue in this case—$348,446.79. If it were not for the arbitrary guidelines loss table divisions, there would not likely be a dispute.[3]

III. Supplemental Information

A. Background

Absent from the presentence report is a fair amount of background necessary to put in perspective Mr. Thelen's involvement with the offense conduct.

Mr. Thelen worked out of an office in St. Johns, not the home office in Standish, which was over 100 miles away. The St. Johns office operated independently from the Standish office for the most part, and it worked on its own projects, many of which were MDOT contracts. Mr. Thelen's days were consumed with managing the projects for which his office was responsible, and he did not devote a great deal of time to the overall operation of SSI. Mr. Thelen's primary means of contact with the home office was by telephone or email.

Mr. Thelen did not have practical control of SSI commensurate with equal ownership. In particular, he did not calculate the overhead for SSI and he was not responsible for the submission of prequalification forms to MDOT. Those responsibilities were left to others.

---

[3] As discussed below, this unique situation where the parties agree that the loss figure straddles two levels is among various reasons to vary downward from the sentencing guidelines calculation.

As to SSI's status as a disadvantaged business enterprise (DBE), Mr. Thelen was ambivalent. In fact, he did not see the purpose or need for it, as he thought that SSI was competitive without such an advantage. When Mr. Semenchuk insisted on seeking the status, he did not pay close attention, and he certainly made no misrepresentations to MDOT on the subject. In fact, when SSI appealed MDOT's denial to the U.S. Department of Transportation (USDOT), Mr. Thelen was surprised that they had prevailed.

Unlike his colleagues, Mr. Thelen made a concerted and sustained effort to cooperate with the government. He gave statements to investigators at the time of the search warrant execution in 2019, and through counsel he arranged multiple proffer sessions beginning in 2022. They were on May 31, 2022, June 30, 2023, July 27, 2023, and July 10, 2024, not to mention the several times he instructed counsel to provide the government with critical information. In fact, his cooperation was so extensive that he was excluded from confidential sessions with the co-defendants pursuant to a joint defense agreement. Also, as part of the plea agreement the government has agreed to consider Mr. Thelen for a substantial assistance reduction.

Mr. Thelen was also instrumental in getting SSI to settle with the government, irrespective of the harshness of the terms. His sole motivation was to keep a company alive so as to continue to provide jobs for those people SSI employed. And there can be little doubt that the "non-Thelen" defendants ultimately settled because of Mr. Thelen's cooperation and settlement.

B.  Letters of Support

In support of its position, the defense provides several letters of support as a collective exhibit. EXHIBIT A. They include a letter from Mr. Thelen describing in detail his regrets and remorse. To summarize the other letters will not do them justice, but suffice it to say that Mr. Thelen is described as a man of strong moral character who is honest and ethical. He is a devoted husband and father (of seven children), and he is committed to his faith and community as exhibited by innumerable acts of goodwill and kindness. He is selfless and always concerned for those who work with him at SSI, as he understands how they value their employment. Most telling among these tributes are those who know well Mr. Thelen's commitment to the employees and the importance of settlement on their behalf, including one from SSI's own counsel.

Mr. Thelen's offense conduct here is truly an aberration. No punishment can be greater than that which he has put himself through. He holds himself—and no one else—responsible for not doing more to make things right.

VI.  Discussion and Motion for Downward Variance

A.  Introduction

As the Court well knows, it is to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). In determining the appropriate sentence, the Court is to consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed –

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553 (a)(1)-(2). The Court is also instructed to consider:

> (3) the kinds of sentences available;
> (4) the kinds of sentences and the sentencing guidelines range for the offense;
> (5) any pertinent policy statement regarding the sentencing guidelines;
> (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and,
> (7) the need to provide restitution to any victims.

18 U.S.C. § 3553(a)(3)-(7).

There is no rule that requires "extraordinary" circumstances to justify a sentence outside guidelines range, because appellate courts are to review under an abuse-of-discretion standard, regardless of whether a sentence is inside or outside guidelines range. *United States v. Gall*, 552 U.S. 38 (2007). There also is no requirement that, after concluding that a variance is warranted, the court must specify a new, adjusted sentencing range, and there is no requirement that the court distinguish adjustments on the basis of whether they are departures or variances. *United States v. Herrera-Zuniga*, 571 F.3d 568, 587 (6th Cir. 2009). It is solely the court's function to assess, weigh and resolve these factors. *See also United States v. Mitchell*, 107 F.4th 534, 544 (6th Cir. 2024).

Here, the defense respectfully submits that given all the sentencing factors a sentence of probation is amply supported.

B.       Reasons to vary downward

Multiple bases exist upon which the Court may rely to vary downward, including his limited role in the offense conduct, his history and characteristics that include support for aberrant behavior, his cooperation, and his extraordinary financial penalties.

If the Court were to grant the defense objection regarding loss, the revised total offense level would be 15, which has a sentencing range of 18 to 24 months' imprisonment. According to the United States Sentencing Commission's Justice Sentencing Information (JSIN) data base, sentences imposed under U.S.S.G. § 2B1.1 at total offense level 15, reflect the following:

> During the last five fiscal years (FY2020-2024), there were 498 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 15 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 335 defendants (67%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 13 month(s) and the median length of imprisonment imposed was 12 month(s).

https://www.ussc.gov/guidelines/judiciary-sentencing-information. This data shows that 33% of offenders at this level received a noncustodial sentence. Moreover, it reflects that a probation request here is within the averages, particularly given that there has been no motion for a downward departure for substantial assistance and that there are a variety of reasons to vary downward.

*Offense Role.* As outlined above, Mr. Thelen's role at the company was different than the others, and so it is with his offense conduct. Unlike the others, his offense conduct is circumscribed by subject matter, time, and the level of intent. As clearly

10

outlined in the factual basis to the plea agreement, Mr. Thelen's responsibility is limited to just two areas—the inclusion of spousal income in overhead and the inclusion IT expense in overhead. PLEA AGREEMENT, Attach. A; ECF No. 278, PageID.3147. It is also limited by time, as he did not learn of the spousal compensation problem until May 2017, and he did not learn of the IT problem until May 2019. And for both of these areas during that limited time frame his criminal liability arises not from willful misconduct but from the failure to correct action taken by others.

Moreover, as demonstrated above, the offense conduct generated at least a debatable amount of loss with the parties acknowledging amounts that straddle two levels—$1.74 million as opposed to $1.39 million.

*Offender Characteristics.* As the letters of support amply demonstrate, Mr. Thelen is a man of strong moral character who accepted responsibility for his transgressions at SSI early on. As discovery progressed, he instructed counsel to arrange proffer sessions with the government that ended up spanning over *two years* while no one else even so much as approached the government about cooperating. Even when things appeared at an impasse, he instructed counsel to continue to engage in plea negotiations. And he did so with one thing in mind—keeping the company going to save jobs for those with whom he had worked so long.

As the letters of support also reflect, Mr. Thelen is a selfless person, a devoted husband and father, and one who cares for his employees and their professional standing. He demonstrated this throughout SSI's negotiations with the government

11

for its nonprosecution agreement (NPA). He steadfastly urged the company and its counsel to reach an agreement with the government for the benefit of the employees, recognizing that without an agreement the company would fail and people would lose valuable jobs.

All of this demonstrates that Mr. Thelen's offense conduct was, indeed, limited and aberrant behavior for a man of his background, faith, and standing in the community.

*Cooperation*. It must also be recognized that Mr. Thelen cooperated. He provided a wealth of information during multiple proffer sessions, and he executed a cooperation agreement upon which the government still can rely. Yet, the government has chosen not to move for a downward departure for substantial assistance. U.S.S.G. § 5K1.1. The government cannot dispute that Mr. Thelen's information was insightful and assisted in their understanding of SSI and the activity of its principles. The defense respectfully requests that the Court take into account that Mr. Thelen cooperated and is not getting any guidelines concession for it under U.S.S.G. § 5K1.1.

*Miscellaneous*. The Court is obviously mindful of the extraordinary financial penalty here. Pursuant to the plea agreement, Mr. Thelen will make restitution to MDOT in the amount of $914,360 and forfeit $814,640, for a total obligation of $1,729,000—that will be satisfied by the time of sentencing. But this financial penalty has not been the only one. His share of the civil settlement with MDOT and the company's NPA settlement cost him an additional $2.3 million.

*Sentencing Options.* The Court has various options for sentencing in this instance. If it were to vary downward to total offense level 11, with a guidelines range of 8 to 14 months' imprisonment, the Court could impose a term of probation with a condition of home confinement. U.S.S.G. § 5C1.1(c)(3). If it were not inclined to vary that much, a lesser variance to total offense level 13 would place Mr. Thelen in Zone C (offense levels 12 and 13), permitting the Court to impose a sentence of imprisonment that includes a terms of supervised release with a condition that substitutes community confinement or home detention according to a schedule, provided at least one-half of the minimum term is satisfied by imprisonment. U.S.S.G. § 5C1.1(d).

IV. Conclusion

The defense respectfully requests that the Court take these matters into account in fashioning a sentence "sufficient, but not greater than necessary, to comply with the purposes" of sentencing and impose a term of probation under appropriate conditions.

Respectfully Submitted,

| | |
|---|---|
| WILLEY & CHAMBERLAIN LLP<br>Attorneys for Defendant Thelen | ROGERS & ASSOCIATES PC<br>Attorneys for Defendant Thelen |
| *s/ Charles E. Chamberlain, Jr.*<br>_____<br>Charles E. Chamberlain, Jr. (P33536) | *s/ Brian P. Lennon*<br>_____<br>Brian P. Lennon (P47361) |
| 300 Ottawa Avenue, N.W., Suite 810<br>Grand Rapids, Michigan 49503-2314<br>(616) 458-2212<br>cec@willeychamberlain.com | 32255 Northwestern Highway, Suite 190<br>Farmington Hills, Michigan 48334<br>(248) 702-6350<br>blennon@healthlex.com |